### J. J. Conn *v.* The State.

1. Charge of the Court.— However correct a principle of law may be in the abstract, it is error to give it in charge when there is a total want of evidence to support the phase of case to which it is applied. See the opinion *in extenso* for a discussion of the rule, and this case for an example.

2. SAME — PRACTICE. — If the jury after retirement desire further instruction upon a question of law, they are authorized to appear before the court in a body, and ask through their foreman, either verbally or in writing, such additional instruction; and if the subject-matter of the requested charge be proper, the court has no option but to give it, which it must do in writing. If the subject-matter be improper, the court should so inform the jury in writing.

3. SAME — CASE STATED. — After being out from 10 o'clock P. M. until 3 o'clock P. M. on the next day without agreement, the jury came into court, and their foreman handed a written paper to the judge. The record does not disclose what was written on the paper. To this the judge replied verbally, " I can answer your communication, but I don't think it proper. I covered the point in my charge." The court then proceeded to say to the jury: " There is another case here that cannot be tried until this is decided. It is ruining. The State pays you two dollars a day, and unless you decide, I will keep you here until Monday morning." To this entire proceeding the defendant excepted. *Held,* that the exception was well taken; that the contents of the paper should have been disclosed by the court, and that the statements of the court to the jury were improper.

4. PRACTICE — PRIVILEGE OF COUNSEL. — See the opinion in this case for an instance of a breach by counsel of the privilege of discussion, wherein the court should have interfered.

5. SAME — SEVERANCE. — The right to sever and place his co-defendant on trial, and to use him as a witness, if acquitted, is a right guaranteed to every one accused of crime.

6. SAME — EVIDENCE. — The witness on the stand manifesting no disposition to evade frank, plain and pertinent answers to questions propounded, the fact that he was related to a co-defendant, who was not on trial, did not authorize the prosecuting attorney to propound leading questions.

7. EVIDENCE. — See evidence *held* insufficient to sustain a conviction for theft.


APPEAL from the District Court of Guadalupe. Tried below before the Hon. E. LEWIS.


The defendant, and Collins and Thomas were jointly indicted for the theft of two yoke of oxen, from two different owners. Upon the application of Collins, a severance was had and the defendant placed upon trial.

He was convicted, and awarded a term of two years in the penitentiary.

James Hutchison was the first witness for the State. He testified in substance that he, Henry Hutchison and Jack Jackson each lost a yoke of oxen in July, 1880. The witness worked his oxen on a Thursday in that month and turned them out, and they were last seen on the following Saturday, near a spring two miles distant from the witness's house. Henry Hutchison, Jackson and the witness searched for the animals and did not find them, nor did they recover them until each had offered ten dollars reward for their recovery. Mr. McCoy found them, after they had been gone three weeks, in the possession of Mr. Richter, in Flatonia, Fayette county, Texas. The witness had not given the defendant or other persons his consent to take the animals. One was branded X.

Henry Hutchison testified, for the State, that he lost a yoke of oxen at the same time the first witness lost his. They were last seen near the spring spoken of by the first witness, on the Saturday alluded to. One was branded J. H. 7, and the other C. Z. One was a deep red and the other a pale red.

C. McCoy, for the State, testified that the two Hutchisons and Jackson hired him to search for the stolen animals. He found them about five miles below Flatonia, in the possession of a man named Richter. Two of the animals were branded 7. H., one X., and one Z. C. He left them at Richter's until he brought the Hutchisons and Jackson, who proved the animals, and then took them home.

Jack Jackson testified to the ownership of the property taken from him. He went with the Hutchisons and recovered them from Richter. All the cattle ran together, and were last seen, before the theft, on Saturday or Sunday.

James Shuler, who lived about five miles from Gonzales, testified that he heard of the theft of the animals either going to or returning from Flatonia. He saw Collins, whom he knew, and another man whom he did not know, near Flatonia. Collins's companion resembled the defendant, but witness could not recognize defendant as the man.

The witness Nelms, in July, 1880, saw three men driving six or seven head of oxen towards Flatonia, but did not recognize the defendant as either of them.

John Nelms testified that he lived in Gonzales county, about five and a quarter miles from the county seat. On one Thursday morning in July, 1880, about daylight, he saw three men driving three yoke of oxen up a hollow which ran between the house of witness and that of a neighbor. Collins came up to the witness and got some matches. The witness had never seen the defendant Conn, to know him.

Wm. Miller testified that Collins and Conn ate breakfast at his house early on the morning on which the cattle were sold at Cobb's. This was early in the morning, for which reason he surmised they camped near his house the night before. Cobb lives one mile east of the witness.

Bom Key testified that he saw the defendant and Collins in July, 1880, at Wm. Cobb's. He rode with them the distance of a half or three quarters of a mile before they reached Cobb's. This was on Saturday. They told him that their names were respectively Collins and Conn, and that they lived near Leesville. When the party got near Cobb's, Collins said he would go up to the house and get water or a watermelon. Cobb at that time was at his pen near his house, in company with his brother and another man who had charge of the oxen. Wm. Cobb asked if the witness did not want to purchase the oxen, saying that he would sell them cheap. The witness responded in the negative, and Collins asked Cobb the price at which he held them. Cobb replied that his price was

$100, and Collins said he believed he would take them, as there was money in them at that price, and asked if the man in charge had a bill of sale to them. The man responded in the affirmative, and exhibited his bill of sale. Collins went into the pen with the man, to examine the oxen, and on his return said to the man: "I will take the oxen, but I have not all the money; you will have to go with me to Gonzales for part of it." The man agreed, as he said he was on his way to Bee county, and Gonzales was on his route. He and Collins then went into the house to draw up a bill of sale. When they returned, Collins told the defendant to turn the oxen out, and let them graze on the road towards Flatonia until his return. Collins and the man then rode off towards Gonzales, but Collins returned within thirty minutes, and said that he had traded the man his pistol at $15, and paid him $85 he had with him. The witness then told Collins that he, witness, was fearful he had bought bad property; that the man had told Cobb that he brought the oxen from Black Jack Springs in Fayette county, the day before, which the witness knew was untrue, as he saw the man the day before, and he had no cattle in charge at that time. Collins asked the witness why he did not inform him before he purchased, and witness replied that he did not hear it until after Collins had gone. He then said he would overtake the man, but finally said, "No, I reckon it is all right, as he says a man owed him, and gave him the oxen to pay. I can sell them, and if they are proven away, I will have to pay for them." He then went on towards Flatonia. The defendant Conn took no part in the proceedings at the pen. He went to the house for water, and the witness did not think he heard any of the conversation about the oxen. All that he did was to drive off the oxen when told to do so. This all occurred Saturday, July 10, 1880.

Wm. Cobb corroborated Key's testimony as to the transactions at the pen, and added that he saw Collins

and defendant going towards Flatonia, the day before, returning late in the evening; and that they informed him at the pen that they took breakfast that morning on Denton's creek; and he, the witness, wrote the bill of sale. Defendant, according to this witness, went to the house during the time the trade was being made at the pen, and took no part in the transaction, except to drive off the oxen when told to do so by Collins.

S. S. Cobb's testimony was the same as that of Wm. Cobb, with the addition that Denton's creek was seven miles west from Cobb's house. He had seen a man, the evening before, crossing the road east of his house with three yoke of oxen. The oxen had different brands, X., Z. C., J. H. 7. He also proved the bill of sale. This witness and Wm. Cobb both stated that neither Collins nor defendant seemed to know the man who sold the oxen.

According to the witness McCoy, Collins and defendant were "raised" within twelve miles of each other, but he did not know that they had ever met before.

J. H. Clayton, in answer to the State's attorney, stated that the defendant since his indictment, told him that he and Collins had been east with horses; that on their return they met a man at Cobb's from whom Cobb purchased some oxen, which he subsequently sold; that he, the defendant, was but a hired hand and had nothing to do with the trade. The witness also stated that he knew that the defendant was hired to Collins. He had been in the employ of the witness, but when his engagement expired, about the last of June, 1880, Collins hired him at fifteen dollars per month. The witness was related to Collins by marriage. The State closed at this point.

The defendant first read in evidence the bill of sale proved by Wm. and S. S. Cobb. It is as follows:
" STATE OF TEXAS, County of Gonzales.

"This is to certify that I have this day sold and conveyed unto Mr. J. F. Collins three yoke of oxen in the follow-

ing brands: one branded X, one branded J. H., two branded F. 7, one branded J, one branded Z. C., for the consideration of ($100) one hundred dollars, paid me in hand, this the 10th day of July, 1880.

"T. H. ẋ Johnson.
mark.

"Witnessed by

"W. B. Cobb,

"S. S. Cobb."

Collins, for the defense, testified that he was a brother of the Collins jointly indicted with the defendant. His brother lived near the witness, and if he was absent in July, 1880, for any considerable length of time, the witness did not know it.

*Ireland & Burges*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

Hurt, J.   Collins, Thomas and appellant (Conn) were indicted for the theft of two yoke of oxen.   A severance being had (upon the application of Collins), Conn was tried and convicted.   Judgment being entered upon the verdict, Conn appeals.

The first matter we will notice is the charge of the court.   While it is true in law that if the accused were present, and, knowing the unlawful intent, aids, abets, assists, encourages, stands guard, etc., he would be as guilty as the person actually engaged in the commission of the offense, yet it is not always proper to give abstract rules of law in charge to the jury.   There must be evidence tending to show that defendant comes within the provisions of the rule; if not, the rule is abstract, and to give it in charge without support in the facts is assuming. It tends frequently to the supposition of the existence of the facts necessary to bring the prisoner within the operation of the rule; thus making the rule self-sustaining, independent of the facts.   Again this charge tends to

impress the jury with the belief that defendant did aid and encourage, etc.; for if he did not, why charge upon this subject? It is the duty of the trial court to charge the law applicable to every phase of the case made by the evidence, or any part of the evidence, leaving the jury to pass upon the strength of the evidence; but the court should never charge a rule of law, though perfectly sound, which has *no support* in the evidence.

We have examined the statement of facts, but found no fact which can be made the basis of this charge. The only fact which can be tortured into such evidence is that, when the oxen were purchased by Collins at Cobb's in the presence of the two Cobbs, defendant was told to turn them out in the direction of Flatonia; and this he did. There is no question but that Conn was a mere hired hand, in the employ of Collins. This being the case, the evidence must tend to show guilt in Collins, and guilty knowledge in Conn in connection with the above act of driving the oxen out of the pen in the direction of Flatonia. The evidence must show that Collins was engaged in the theft of the cattle, and that Conn knew this, and that when he turned them out of the lot, he *intended thereby* to aid, encourage, or assist Collins in the theft. The act (there being nothing said by Conn) must not only aid, encourage, or assist in the theft, but such an effect must have been intended. If the natural consequence of the act tends to aid, assist, or encourage in the theft, that it was intended to have such effect is presumed.

If, however, the act isolated from the other facts was not calculated to have such effect, the evidence must show the intent with which the act was done. This may be done by the surrounding facts or circumstances. When these are looked to, they not only fail to indicate a wrong intent, but tend strongly to rebut such an inference. The oxen had been purchased by Collins at the house of Wm. Cobb in the presence of Key, Wm. Cobb

and S. S. Cobb. A bill of sale was taken, and it was witnessed by the Cobbs, and correctly described the oxen. The trade being consummated, Collins told defendant "Go turn out the oxen, and let them graze on the road towards Flatonia." This he did, and this was all he did. This act, viewed in connection with the immediate circumstances, cannot justly be construed in a culpable light. It must be viewed in the light of these facts,— the facts *immediately attending* the act of defendant, to wit, turning the oxen out of the pen; for there is no evidence connecting defendant with the oxen prior to the sale to Collins. (The Reporters will give the evidence.) We are of the opinion that the court erred in giving the charge complained of; and we are also of the opinion that the evidence fails to support the verdict, and that a new trial should have been awarded.

Bill of exceptions No. one informs us that the cause was submitted to the jury about 10 o'clock, P. M., on the 4th of November, and that at three o'clock of the 5th, without agreeing they came into court, and presented to the court a piece of paper "containing writing," the purport and effect of which was not made known to defendant or his attorney; that the court, after reading it, said: "I can answer your communication, but I don't think it proper; I think I covered the point in my charge;" and then went on to say "there is another case here that cannot be tried till this is decided; it is ruining,— the State pays you two dollars a day, and unless you decide I will keep you till Monday morning."

Article 696, Code Crim. Procedure, enacts that " The jury, after having retired, may ask further instructions of the judge touching any matter of law. For this purpose the jury shall appear before the judge, in open court, in a body, and through their foreman state to the court, either verbally or in writing, the particular point of law upon which they desire further instructions, and the

court shall give such instructions in writing; but no instruction shall be given except upon the particular point on which it is desired." The court must instruct upon the point presented in the request of the jury, and this must be done in writing. If not proper matter for instruction, the court must inform the jury of this fact in writing. In this instance the defendant, his attorneys, nor this court, so far as the record shows, is informed of the contents of the paper presented to the judge. From the answer of the judge thereto it evidently contained a request for further instructions upon some point. If the point was a proper one for instruction, the court was left no alternative but to respond. The Code is imperative; hence the necessity,—the absolute necessity,—of disclosing the contents of this paper. Defendant excepted to this secret, *ex parte* proceeding between the jury and the judge; and we think he had just cause to object to and protest against this very anomalous conduct.

The spirit and genius of our Codes are opposed to any and every thing which militates against a *fair, open* and public trial. No step in the *trial* can be taken in the absence of the defendant. If allowed to be done or had secretly, his presence would be a mockery,—a very serious farce to defendant. Why the judge informed the jury of the fact,—than which none was better known to each and every member thereof,—that the State paid them two dollars each per day, we cannot comprehend. Taking the facts immediately attending this matter, we find a wrong impression was made upon the jury. These remarks and all of like character are wrong, and should not be indulged in.

It appears by the 4th bill that "the district attorney said to the jury, 'They have severed and Conn is put on trial, and you are told he was only a hired hand. They hope thus to clear this man and then he is to swear his confederate clear. I tell you this is the trick.'

To which the defendant objected, and asked the court to stop such statements; which was refused by the court. Continuing, the district attorney said, ' Good men in this county, and the best men in Gonzales county, desire the conviction of this man and his partner.' To all of which the defendant objected. The court overruled the objections, remarking, ' he speaks at his peril; I will sign your bill of exceptions.' "

Collins had the right to place Conn on trial first, and, if acquitted, make a witness of him. This is not only permitted by the Code, but is in perfect accord with reason and justice; and the judge should not have permitted for a moment, an attack, such as the above, upon proceedings which are not only just but expressly authorized ·by the very Code of laws for a supposed breach of which the defendant was being tried. If to place Conn on trial first, with a view of acquittal and to make him a witness, be a trick, it is one expressly provided for by law. If Conn be guilty, the State could defeat the trick by proving his guilt, under the rules of law. This response of the judge is astonishing indeed. Considering the very obnoxious and flagrant remarks of the district attorney, we cannot conceive how it were possible for any person *save defendant* to be in peril. That the district attorney was not is very evident from the fact that defendant's motion for a new trial was promptly overruled. We are left to conclude from the latter part of the remark, to wit, "I will sign your bill of exceptions," that the danger or peril was to be from the hands of this court; if so, we are equal to the occasion; for we will not permit one accused of theft or any other offense to be convicted by such means, though all of the good, better, or best men of this State desire his conviction.

We will not discuss why or how these remarks of the district attorney injure the rights of defendant. Nor will we quote authorities in condemnation of these re-

marks, nor to show that it was the duty of the judge to have promptly stopped the district attorney, and inform the jury that they should not be influenced by the wishes of good or bad men, but that they should and must try defendant by the law and the evidence of the witnesses,— witnesses sworn in the case.

The witness James Schuler was related to Collins. The district attorney asked and obtained leave to lead, and did propound leading questions to this, the State's, witness. There was no disposition to evade or answer in a doubtful or double sense, nor was there a disposition shown not to answer frankly, plainly and pertinently each and every question propounded. This being the case, was the fact that witness was related to Collins, who, though jointly indicted, was not on trial, a good and sufficient ground to authorize leading questions? We think not.

For the errors above indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*